398 So.2d 608 (1981)
Robert M. BREITHAUPT, Jr., Plaintiff-Appellant,
v.
HOUSTON GENERAL INSURANCE COMPANY, Defendant-Appellee.
No. 7215.
Court of Appeal of Louisiana, Third Circuit.
March 12, 1981.
*609 William Henry Sanders, and Norris Dale Jackson, Jena, for plaintiff-appellant.
Martzell & Montero, Wilson M. Montero, Jr., New Orleans, Gist, Methvin, Hughes & Munsterman, H. B. Gist, Jr., Alexandria, Gold, Little, Simon, Weems & Bruser, Charles S. Weems, III and Herbert Mang, Jr., Alexandria, for defendant-appellee.
*610 Before DOMENGEAUX, STOKER and DOUCET, JJ.
STOKER, Judge.
This appeal presents the question of the appropriateness of granting a motion for a directed verdict in a jury trial.
Plaintiff Robert M. Breithaupt, Jr., alleges he was shot in his upper thigh while deer hunting and thereby sustained personal injuries. The petition in this suit alleges that Robert "Luke" Sellers did the shooting. In this particular suit the defendant is Houston General Insurance Company (Houston General). Plaintiff alleges that Sellers was acting in the course and scope of his employment with Golden Age Nursing Home at the time of the shooting. Houston General was the liability insurer of Golden Age Nursing Home (Golden Age). Separate suits were filed against Sellers and Golden Age. The cases were tried in a consolidated trial.[1]
At the conclusion of the plaintiff's case in chief the trial court granted a directed verdict against the plaintiff in favor of Houston General Insurance Company. Plaintiff appeals from this ruling.
The suit against Sellers was previously before this court on a similar issue, that is, whether the trial court erred in granting a directed verdict in favor of Sellers. In the appeal in the Sellers' case, we affirmed the trial court's judgment granting Sellers a directed verdict. 380 So.2d 1257 (La.App.). The Louisiana Supreme Court reversed and remanded the case to the trial court for a new trial. Breithaupt v. Sellers, 390 So.2d 870 (La.1980). The present appeal in the case against Houston General Insurance Company has never been acted upon, and the issues in that appeal we now decide.
The essence of the claim of plaintiff against Houston General Insurance Company is that Sellers, not only negligently shot plaintiff, but that Sellers was in the course and scope of his employment with Golden Age Nursing Home at the time of the alleged shooting. Under the circumstances plaintiff urges that Golden Age is liable to him under the principle of respondeat superior. As the liability insurer of Golden Age, Houston General would be liable to the plaintiff if (1) Sellers is found liable and (2) if Sellers is found to have been acting within the course and scope of his employment at the time of the negligent shooting.
Inasmuch as the Louisiana Supreme Court has decided that the case against Sellers must be remanded for a new trial, there is only one basis on which the directed verdict granted in favor of Houston General Insurance Company may now be found valid. That basis would be a finding that even if it is found that Sellers did shoot Breithaupt and was liable in damages to him, Sellers was not in fact acting in the course and scope of his employment at the time of the alleged tort.
The standard of proof by which a trial judge must decide whether or not to grant a motion for a directed verdict has been judicially formulated because the legislature did not provide a standard. Breithaupt v. Sellers, supra. Stated briefly, the judicially formulated standard is: Viewing all the evidence in a light most favorable to *611 the plaintiff, could reasonable persons arrive at a contrary verdict, that is, could they reach a verdict other than one in favor of the defendant.[2] In order to apply that standard our first step is to determine from the transcript of the record of the consolidated trial what were the facts on the point at issue viewed in a light most favorable to the plaintiff.
Before determining the facts most favorable to plaintiff-appellant it is necessary to understand plaintiff-appellant's asserted basis for liability of Golden Age, the insured of Houston General. To begin with plaintiff set forth the asserted basis at some length in a supplemental and amending petition filed December 5, 1978, which we include as Appendix I. In essence the claim of plaintiff is that Sellers was performing duties in furtherance of the nursing home's business by entertaining one Nere Ourso at a deer hunt when he allegedly shot plaintiff. More specifically plaintiff speculated, and sought to have the jury speculate, that Sellers sought through deer hunting with Ourso to persuade Ourso's wife to return to the nursing home as an employee where she had formerly been employed.

PROCEDURAL CONSIDERATIONS
Before proceeding to the merits of this case certain procedural matters must be addressed. Although the briefs and oral argument of counsel have not pinpointed the precise issues of a procedural nature before us in this appeal, we think we perceive the general nature of those issues. To approach them it is necessary that we first burden this opinion with a rather extensive chronicle of certain procedural events. We will begin at the point where plaintiff-appellant concluded his case in chief in the trial before the jury.
At the conclusion of plaintiff's case on March 23, 1979, the trial court granted a motion for a directed verdict in favor of Robert "Luke" Sellers. The trial court was of the opinion that a motion for directed verdict on behalf of Houston General was therefore moot and did not then rule on Houston General's motion. The jury was discharged at this point. On March 26, 1979, the trial court granted Houston General's motion and the following minute entry was entered in the trial court's records:
"After reviewing testimony on the issue of scope of employment, the motion for directed verdict made by counsel for Houston General Insurance Company was granted."
The trial court signed a consolidated judgment on April 4, 1979, which dismissed both Sellers and Houston General. This judgment recited that the judgment had been rendered in open court on March 23, 1977. This judgment was presented to the trial judge by counsel for plaintiff-appellant. Tr. 253, Vol. I, Record # 7215.
On the same day, April 4, 1979, plaintiff-appellant obtained an order of appeal. Tr. 255, Vol. I, Record # 7215. A new order of appeal was obtained on May 21, 1979, to correct clerical errors in the April 4, 1979, order of appeal. Tr. 256, Vol. I, Record # 7215.
On May 3, 1979, a second consolidated judgment was signed (apparently at the instance of Houston General) which is couched in the same language as that of the judgment of April 4, 1979, except that it refers to Houston General only. Tr. 254, Vol. I, # 7215. It grants (as did the April 4, 1979, judgment) the motion for a directed verdict filed by Houston General and dismisses plaintiff-appellant's demands against Houston General. In its brief Houston General explains that neither it nor its counsel was ever served with a copy of the judgment of April 4, 1979; for that reason the judgment of May 3, 1979, was prepared and submitted by Houston General.
*612 On May 8, 1979, plaintiff-appellant filed an application for new trial as to the judgment signed on May 3, 1979, "limited to only the question of lack of jurisdiction". No action was taken on this application for a new trial at that time. Tr. 252, Vol. I, Record # 7215.
The appeal in this case was lodged in this court on May 25, 1979.
Subsequently, Houston General noted that its judgment of May 3, 1979, (which tracked the language of the judgment of April 4, 1979,) was in error in reciting that the judgment in its favor was rendered on March 23, 1979. It was rendered on March 26, 1979. To correct this clerical error Houston General presented a motion and order to the trial court on November 26, 1979, seeking an amendment of the judgment of May 3, 1979. A consolidated judgment reflecting the requested amendment was signed by the trial judge on November 30, 1979. Tr. 2 and 4, Supplemental Record Volume in appeal # 7215.
On November 30, 1979, Houston General requested a fixing of a hearing on plaintiff-appellant's application for new trial and notice was given on December 5, 1979, of a hearing to be held on December 21, 1979. A minute entry for December 21, 1979, shows that the motion for new trial was denied on December 21, 1979, on the authority of Cowen v. Cowen, 375 So.2d 118 (La. App. 3rd Cir. 1979).
On December 18, 1979, plaintiff-appellant appealed in both suits (our numbers 7214 and 7215) from the judgment "rendered" on March 26, 1979, and "signed" on November 30, 1979. The appeal was granted December 18, 1979. On December 21, 1979, plaintiff-appellant filed another appeal in both cases, the latter appeal being from the judgment signed on May 3, 1979.
We are at some loss to determine precisely what significance this procedural history plays in this appeal. In plaintiff-appellant's motion for new trial filed May 8, 1979, he alleges that the trial court lacked jurisdiction to sign the judgment of May 3, 1979, to correct the error as to the date of rendition. In the appeals taken December 18 and 21, 1979, plaintiff-appellant alleges that the correction of the clerical error obtained by Houston General was unauthorized by LSA-C.C.P. art. 1951 because it resulted in a change in substance.
We conclude that the procedural tangle reviewed above presents no problems and the appeal with reference to Houston General is properly before us. If plaintiff-appellant's application for a new trial (filed May 8, 1979) is viewed as being in substance a true application for new trial, it would raise questions as to timeliness of filing and of waiver through the appeals of December 18 and 21. Since the hearing on the application for new trial was set for December 21, 1979, the granting of the appeal on that date brings into question the authority of the court to hear the application for new trial. The trial court in its minute entry denying the motion for new trial cited Cowen v. Cowen, supra. That case held that an appeal by a party who has filed an application for a new trial waives any right the party may have to a new trial in the trial court and the appeal divests the court of jurisdiction. It should be borne in mind that plaintiff-appellant originally appealed on April 4, 1979. It should also be noted that the appeals of December 18 and 21, 1979, were restricted to the validity of the amendment of the judgment of May 3, 1979.
While we have some doubt that the pleading filed on May 8, 1979, actually was a motion for a new trial, clearly its function was to challenge the jurisdiction of the trial court to amend the judgment of May 3, 1979. Courts may and should treat pleadings as what they are rather than what counsel label them. Broday v. Broday, 360 So.2d 645 (La.App. 3rd Cir. 1978); Cvitanovich v. Sorli, 347 So.2d 1204 (La.App. 1st Cir. 1977); Davis v. Southern Farm Bureau Casualty Ins. Co., 324 So.2d 468 (La.App. 3rd Cir. 1975) and Moore v. Shell Oil Company, 228 So.2d 205 (La.App. 3rd Cir. 1969), writ refused, 230 So.2d 587, 255 La. 278 (1970). The application for new trial filed May 8, 1979, reads as follows:

*613 "APPLICATION FOR NEW TRIAL
"NOW INTO COURT THROUGH UNDERSIGNED COUNSEL comes Robert Milton Breithaupt, Jr. and with respect represents that:

1.
"Petitioner is entitled to and desirous of a Contradictory Hearing in this matter limited only to the Judgment signed in Jena, Louisiana on the 3rd day of May, 1979.

2.
"Petitioner respectively shows that this Court was without Jurisdiction to sign a Judgment in this matter as Jurisdiction of the trial court ended when the matter was appealed.
"WHEREFORE ROBERT MILTON BREITHAUPT, JR. PRAYS that a Hearing be had on this matter limited to only the question of lack of Jurisdiction and rehearing only as to the signing of the May 3, 1979 Judgment."
Regardless of how this pleading is classified, we think that plaintiff-appellant waived his rights to have the matter determined in the trial court. Apparently plaintiff-appellant never sought to have the motion set for a hearing. The hearing was set at the request of appellee Houston General. Tr. 6, Supplemental Record Volume in appeal # 7215. It was fixed by the court for hearing on December 21, 1979. When plaintiff-appellant filed his appeals on December 18 and 21, 1979, he manifested his desire that the question raised in the motion for new trial not be passed on by the trial court. Under the circumstances, no matter how the motion is classified from a procedural standpoint, we think the principle of Cowen v. Cowen, supra, applies and a waiver took place. If the trial court lacked authority to rule on the matter when it denied the new trial on December 21, 1979, it does not affect the result. It is our ruling that the rights of plaintiff-appellant to have the motion heard and ruled upon were waived or abandoned.
If we correctly understand plaintiff-appellant's approach, he preferred to raise the matter of the trial court's authority to amend on appeal rather than in the trial court. In pertinent part plaintiff-appellant alleged in the consolidated appeal filed on December 18, 1979, as follows:

"CONSOLIDATED CASES
"PETITION FOR APPEAL
"The petition of Robert Milton Breithaupt, Jr., plaintiff in the above entitled and numbered cause respectively represents:

1.
"Petitioner desires to appeal devolutively from the final judgment rendered in the above cause on the 26th day of March 1979 and signed in Jena, Louisiana on the 30th day of November, 1979.

2.
"Petitioner shows that Article 1951 of the Louisiana Code of Civil Procedure provides for the amendment of a judgment by the trial court to alter the phraseology of the judgment, but not the substance; or to correct errors of calculation.

3.
"The defendant, Houston General Insurance Company, by motion filed in the record of this proceeding attempts to change the substance of the judgment rendered herein on March 23, 1979; and said judgment was signed on April 4, 1979; and is now scheduled for oral argument on January 9, 1980 under docket # 7214 and 7215, Court of Appeal, 3rd Circuit, State of Louisiana."
The appeal filed on December 21, 1979, raises the same issue in abbreviated form.
In Goodwin v. Gulledge, 391 So.2d 883 (La.App. 3rd Cir. 1981) we recently considered the authority of a trial court to amend a final judgment at any time to correct typographical errors. A given case is to be tested under LSA-C.C.P. art. 1951. In Goodwin v. Gulledge, supra, we found *614 that correcting the docket number erroneously set forth in the original judgment was not a matter of substantive change. Here the judgment as to Houston General was rendered on March 26, 1979, and not March 23, 1979. We deem the trial court to have had authority to amend the judgment in question to reflect the true date and that it did not change the substance of the judgment.
With respect to any argument that the trial court did not have jurisdiction to amend the judgment in question because plaintiff-appellant had already appealed on April 4, 1979, the answer is that the trial court retains jurisdiction to make such corrections. In Tangi Ready Mix Concrete v. Edwards, 356 So.2d 526 (La.App. 1st Cir. 1977) the Court of Appeal for the First Circuit stated:
"The jurisdiction of the Trial Court over a case on appeal is not divested for the purpose of correcting any misstatement, irregularity, informality, or omissions of the trial record. LSA-C.C.P. art 2088. This limited retention of jurisdiction by the Trial Court, however, does not affect the jurisdiction acquired by the appellate court by the perfecting of an appeal. As to this particular retention of jurisdiction by the Trial Court, it is concurrent with the appellate court. LSA-C.C.P. art. 2132."
Other intriguing questions suggest themselves. For example the judgment of May 3, 1979, is the same as the judgment signed on April 4, 1979, insofar as it affects Houston General. Both contained the error reciting that the judgment in favor of Houston General was rendered on March 23, 1979, rather than March 26, 1979. We do not consider the effect of a judgment reading substantially the same as a judgment which has already been signed. But see Cowen v. Cowen, supra. While the May 3, judgment was corrected on November 30, 1979, the judgment of April 4, 1979, was never corrected. Despite the procedural morass which exists we think that in the interest of justice and judicial economy we should consider that the appeal in this case is properly before us and that we should and have addressed all substantial procedural issues. Under the circumstances we proceed to a consideration of the merits of this appeal.

MERITS OF THE MOTION FOR DIRECTED VERDICT
On the merits of this case we must determine, by viewing all the evidence in a light most favorable to plaintiff, whether reasonable persons acting as a jury could reach a verdict contrary to defendant-appellee, Houston General Insurance Company.
Viewed in the light most favorable to plaintiff-appellant, Robert M. Breithaupt, Jr. (Breithaupt) we find the facts to be as follows:
Plaintiff called Nere Ourso as a witness but directed questions to him solely concerning the facts of the hunt and events which occurred after he heard the shot which evidently wounded plaintiff Breithaupt. No questions were asked concerning social relations between Ourso and Sellers or whether either was entertaining the other. Tr. 360-366 on redirect Tr. 374-377, 379-386. (All references to transcript pages and quotations which appear hereafter are contained in the record of transcript in our number 7214, Breithaupt v. Sellers.) In response to a question asked by Sellers' counsel which was not related to the respondeat superior issue, Ourso stated that he had hunted with Sellers previously. Tr. 371. In summary no one asked Nere Ourso any questions bearing on the question involved in this appeal.
Mr. Aaron Joubert testified for plaintiff on the respondeat superior issue. He once owned and operated Golden Age Nursing Home, but had been unconnected with the nursing home for four years. He testified that as administrator he hired and fired employees, had to be on the job a minimum of twenty hours per week, was in charge of public relations, and supervised the nursing staff. Houston General objected on the ground of relevancy when Mr. Joubert was asked to state some of the things he did as *615 administrator of the nursing home regarding public relations. The objection was sustained.
Plaintiff-appellant called Mr. Walter C. Fowler, one of the partners of Golden Age, and asked him if he heard Mr. Joubert's testimony and if he agreed that the duties of the nursing home administrator listed by Mr. Joubert were substantially correct. Mr. Fowler agreed that they were. That was the only question Mr. Fowler was asked other than qualification and foundation questions.
On cross examination Robert "Luke" Sellers stated that as administrator of Golden Age he saw to the overall operation of the nursing home including hiring of the employees. In that capacity he did public relations work for the nursing home. He was on a salary and was on call at all hours of the day. He would use his personal vehicle if occasion called for it, but he was furnished a company car for company business. On a very limited basis he might occasionally use the company car for personal business, such as attending Kiwanis Club meetings. Largely it was up to Sellers to use his own judgment as to when to use the company car and when not to.
Sellers further testified that he had authority to hire the nursing staff, including the head nursing staff. The wife of Nere Ourso was a former employee of Golden Age. She was a good nurse, and in response to a question Sellers agreed that she would be "a potential employee". Tr. 326. With reference to the deer hunt in question Mr. Ourso asked Sellers to go on the hunt. Tr. 326.
On direct examination, Tr. 340-341, Sellers testified he went on the deer hunt for his personal pleasure and recreation. Mr. Ourso called him and related that a Mr. Grayson proposed a hunt and Ourso suggested that he join him. Mr. Ourso was not working at the nursing home and was not doing any business with the nursing home. He had never done any business with the nursing home.
Sellers' testimony concerning Mr. Ourso's wife is recorded on pages 341 and 342 of the transcript:
"Q Was his wife working there at that time?
A No, sir.
Q Why had she left?
A Dr. Sirikul had offered her more money, a job that didn't pertain to as many hours that Mrs. Ourso had put in.
Q Were you trying to get her to come back to work?
A No, sir. She wouldn't have come back anyway. She was making more money for Dr. Sirikul than she was at the nursing home.
Q What was the purpose of this hunting trip?
A It was just that Mr. Grayson had called Nere or they had talked and said that they knew that maybe we could kill a deer in that area, and Nere said why don't we go out there and see if we can kill something.
Q Had you hunted with him before?
A Yes, sir.
Q Was the trip purely for your personal pleasure and recreation?
A It was.
MR. GIST: That's all.

RECROSS EXAMINATION
BY MR. SANDERS:
Q When Mrs. Nere Ourso left, she left in good standing with the nursing home, did she not?
A She did.
Q And, I believe, there would be good tactics to have satisfied employees at the nursing home, wouldn't it?
A That is true.
Q And at some places money is not the only criteria for people working. Have you had that experience? Or, is money the sole criteria?
A In this case, it was the money.
Q In this case it was the money. Is this always the case?
*616 A No, sir. She worked less hours for more money."
Counsel for plaintiff-appellant called James Hodge and attempted to qualify him as an expert witness. Tr. 456.
Mr. Hodge had done oil field work and was self-employed at the time he testified. He operated Poole's Service and Salvage which was engaged in recycling automobile salvage. His business was located across the street from Golden Age Nursing Home and he had been in the home frequently. Houston General early made objection to the relevancy and materiality of Mr. Hodge's testimony on the ground that he was not qualified to give any testimony concerning Golden Age or Sellers from personal knowledge.
It developed that plaintiff-appellant wished to elicit from Mr. Hodge, as an "expert", his opinion as to "the different forms of entertainment that's available to residents of LaSalle Parish." Tr. 459 Upon objection considerable discussion took place concerning the relevance and materiality of such information. The court admonished counsel to proceed but to "move to the point in the case." Counsel then asked the question:
"Q Mr. Hodge, please state to the Jury the areas of LaSalle Parish for business people to take their friends, business employees, and customers?" Tr. 460
Immediate objection to the question was lodged on the ground that the question, while relevant to what Golden Age might do in general, it was certainly not relevant to what Mr. Sellers was doing on the day and on the occasion of the shooting. After some argument and discussion counsel for plaintiff-appellant agreed to rephrase his question and asked:
"Q Do you have an opinion as to whether or not people that are in business take their employees on hunting trips?" Tr. 462
Upon further objection which was sustained by the trial court, counsel for plaintiff-appellant asked that the jury be excluded from the courtroom. Out of the presence of the jury counsel made an offer of proof of the testimony of Mr. Hodge. The trial court never accepted Mr. Hodge as an expert in the field in which he was offered and continued to admonish counsel that Mr. Hodge must confine any testimony he gave to specific knowledge of matters pertaining to Golden Age and Mr. Sellers' relationship to it.[3] Houston General continued to maintain that the questions were inadmissible because they did not relate to what motivation Mr. Sellers had in engaging in the particular deer hunt in question. Ultimately the trial court sustained all objections to Mr. Hodge's testimony. Prior to such ruling and before the witness could be instructed Hodge responded to the following question.
"Q All right sir. Do you have an opinion as to whether or not business people do indeed take their employees to such places that are available here in LaSalle Parish particularly do they take them hunting. Deer hunting you mentioned.
A Well, I do. And, on numerous occasions I've met other people while hunting. " Tr. 465
The questioning of Mr. Hodge and his testimony made it clear that he had no knowledge of policies governing the operation of Golden Age, and no attempt was even made to have him testify concerning *617 any motivation or intentions relative to Mr. Sellers participating in the deer hunt with Nere Ourso. The sole purpose of his testimony was to establish that business establishments in LaSalle used deer hunting in LaSalle Parish as a means of good public relations. Considered in the light most favorable to plaintiff-appellant (and irrespective of whether Mr. Hodge is an expert in such matters) we can accept the testimony which Mr. Hodge gave over objection that business people in LaSalle Parish do use deer hunting for the business purposes mentioned. We note however that such a fact, which might well be assumed, goes no further than to establish general business practices in LaSalle Parish. None of Mr. Hodge's testimony related such practices to Golden Age. Mr. Hodge did not testify that Mr. Sellers was deer hunting for any reason that would promote Golden Age's business interests.
After plaintiff finished his case in chief the defendants moved for directed verdicts in their favor. Houston General based its motion on the ground that plaintiff had adduced no evidence to prove that Mr. Sellers, either at the time he went on the deer hunt or at the time of the shooting, was pursuing any purpose of or on behalf of Golden Age. Tr. 731-732.[4] Argument on Houston General's motion was extensive and is recorded at transcript pages 732 through 753. We will selectively quote at some length from the argument of counsel and responses of the trial court because the selective quotations aptly set forth what plaintiff-appellant relies upon to prove his case against Houston General, that is, to prove Sellers acted in the course and scope of his employment with Golden Age by participating in the deer hunt. The pertinent argument commencing on transcript page 733 is as follows:
"MR. SANDERS: ... and it develops, that indeed, in this particular case, that Mrs. Nere Ourso, was a former employee, and an excellent employee, and, I think that the jury canhas now, a question of fact, as to whether or not Mr. Sellers, at that time was, uh, acting in the interest of good will in the interest of seeking better help for the nursing home. And, particularly, uh, Mrs. Ourso, as a type employee that he would be searching for, being that she was a good employee. A jury has heard this testimony, uh, they can now make a decision, the decision being, did they believe Mr. Sellers' testimony when he was so testifying, did they believe Mr. Fowler ...
"THE COURT: All right, all right. Now, that's part of it. If they choose not to believe Mr. Sellers, where is there testimony to the effect this was a business venture, rather than a personal mission? I think that is what Mr. Gist is ...
"MR. SANDERS: ... the chance is
...
"THE COURT: ... raising by this, he's suggesting that there is no evidence, to the effect that it was anything other than a personal mission.
"MR. SANDERS: If they believe to if the jury, believes, that Mr. Sellers, did not, or, did the shooting, if they believe that he did the shooting, if they believe he did the shooting, then at that point, they don't believe Mr. Sellers. At that point, you have, you still have a question then, was Mr. Sellers engaged in developing good will, and public relations. If the jury doesn't believe he was, if they don't [believe] Mr. Sellers when he says that he did not do the shooting, they have the right to believe that Mr. Sellers was also lying in some of his other testimony. And, if heif they believe that, then they must believe Mr. Fowler, Mr. Joubert, to say that this is a duty of the nursing home administrator, and if they do that, there is a question for them to decide whether or not he was in the course and scope of his employment.
"THE COURT: Well, on this issue, if you disregard everything, that Mr. Sellers said, I'm still raising a question, where do *618 you get the evidentiary support for the proposition that it was [not] a personal mission. As I understand the testimony, and I'd have to look back over a transcript, I suppose, uh, I'm not sure whether this came out from Mr. Sellers or Mr. Ourso, to the effect that Sellers was in his own vehicle, and that the idea for the hunt originated with Ourso or at least Ourso called Sellers and said, let's go hunting. And the two of them went out there, in other words, the invitation came from Ourso, not from Sellers. You could just cut all of Sellers' testimony out of the record, and I think you would still come back to the situation, or, I'm looking, seeing if you can recall any specific testimony, that said that in the operation of this nursing home by Mr. Fowler and his partners, that they expected Mr. Sellers to do this particular type of entertainment. Or, that they paid for it, or sponsored it, or someway, uh, had him do it. Or, that he did it.
"MR. SANDERS: They give him the authority and the discretion, whether to do this type of entertainments. They provided him a vehicle ...
"THE COURT: Even if he had that authority, it's still necessary to prove that that's what he did.
"MR. SANDERS: He used his personal vehicle, interchangeably, with the company vehicle. He used his personal vehicle interchangeable on many occasions. Had he been in the company vehicle, it may have looked a little bit better, but, the fact still remains, it's the same situation. He had the power and authority to ...
* * * * * *
[Commencing at transcript page 749]
"THE COURT: They have the right to disbelieve somebody, and if they do, they just disregard it. They don't jump to the opposite conclusion. They don't have the right to do that. If they come to another conclusion, it's got to be supported by evidence.
"MR. SANDERS: They have the right to consider the entirety of the testimony, and believe part, and disbelieve part. They have that right.
"THE COURT: Well, even picking whatever you want to pick in the form of questions and answers, I don't see anything where you have a witness that said, this was a business purpose trip.
"MR. SANDERS: If the jury, should disbelieve Mr. Sellers when he says, I was on a personal mission, then the rest of the testimony is the duties of Mr. Sellers. One of which, is public relations and also hiring and firing employees. The jury at that time, has the right to decide on what mission was he on. The Court can submit these questions to the jury by written interrogatories.
* * * * * *
[Commencing at page 750]
"THE COURT: The jury can reach any conclusion that's supported by evidence, they're not allowed to speculate, or, just jump to ...
"MR. SANDERS: Could I have the Court's ruling. The Court ...
"THE COURT: ... you know I think Mr. Sellers is [sic] probably said more on the topic of what the dutieswhat were his duties, than anybody else.
"MR. SANDERS: That's right.
"THE COURT: And, whether you accept his testimony, on that point, or, reject it, well, particularly if you reject it, you don't have any information about what were the policies of the nursing home.
"MR. SANDERS: The jury, Your Honor, has the right to accept part and reject part. Now, if it's this crucial it can be placed on a witness interrogatory to the jury, as to what part they reject. But, I think the jury has the right to make a determination to accept part and reject part of the entirety of Mr. Sellers testimony.
* * * * * *
[Commencing at transcript page 753]
"MR. SANDERS: If you strike only the question onthat Mr. Sellers ... went hunting, as a personal mission, if the jury disbelieved that, they still have *619 the right to decide what he was doing out there and based on the rest of his testimony, that being was he entertaining employees, was he doing public relations, or what was hewas he on a personal mission. They still have the right to make the decision. Once they reach that point, they still have the right to make that decision.
"THE COURT: All right. Any further arguments?
MR. GIST: No, Your Honor."

CONCLUSION
We conclude that the trial court properly granted the motion for directed verdict in favor of Houston General Insurance Company. We need not further burden this opinion with a detailed recapitulation of the evidence. It is manifest that no jury issue was ever made on the question of whether Robert "Luke" Sellers was acting in the course and scope of his employment with Golden Age when, and if, he fired the shot which wounded plaintiff-appellant.
All plaintiff-appellant has done is to speculate through pleadings, arguments and questions of a general nature. It is clear that plaintiff-appellant contends that the jury should be allowed to speculate. Faced with the absence of specific evidence of any kind counsel suggests a specious and casuistic argument. The argument is that if the jury should conclude that Sellers did shoot Breithaupt, it must necessarily conclude that Sellers testified falsely when he denied doing the shooting. Then appellant argues that having determined that Sellers testified falsely about a material fact he would testify falsely about all other material facts. Hence, appellant argues that inasmuch as Sellers denied he was on a business mission for Golden Age, the jury could conclude this was false testimony and thus make the positive conclusion that he was within the course and scope of his employment. We agree with the trial court that to allow the question to go to the jury on this basis would be misapplication of evidentiary rules. As a predicate to allowing the jury to consider Sellers' credibility on the question at issue, the record should first contain some positive evidence that Sellers was within the course and scope of his employment. There is no such evidence.
Plaintiff-appellant here seeks to use the rule of falsus in uno, falsus in omnibus as a rule of proof. We regard that rule as relating to judging credibility only. Allowing its use as a rule of positive proof would be contrary to logic in our opinion.
For the foregoing reasons we affirm the judgment of the trial court insofar as it granted the motion for a directed verdict in favor of Houston General Insurance against plaintiff-appellant, Robert M. Breithaupt, Jr. All costs of this appeal are assessed to plaintiff-appellant.
AFFIRMED.
 APPENDIX I
 NO. 15,423
ROBERT MILTON BREITHAUPT, JR. 28th JUDICIAL DISTRICT COURT
VERSUS PARISH OF LASALLE
HOUSTON GENERAL INSURANCE
COMPANY STATE OF LOUISIANA
FILED: Dec. 5, 1978 CLERK: /s/ Nell A. Ganey

FIRST SUPPLEMENTAL AND AMENDING PETITION
NOW INTO COURT THROUGH UNDERSIGNED COUNSEL comes Robert Breithaupt and with respect represents that answers have not been filed by Houston General Insurance Company and plaintiff is entitled to and desirous of supplementing his original petition by adding the following paragraphs to wit:

*620 9.
Petitioner shows that Robert B. Sellers was in the course and scope of his employment at the Golden Age Nursing Home for the following reasons:
a. While employed at the Nursing Home the defendant, on or about November 30, 1977 arranged a hunting outing with a member of the general public and particularly one who is identified as Nere Ourso.
b. Robert B. Sellers arranged a hunting outing with a member of the general public for the benefit of the Nursing Home.
c. Nere Ourso, his ascendants, descendants, and collateral relations, as well as fellow employees, friends, and acquaintances are candidates, potential employees, employees, and future employees, and clients of the Golden Age Nursing Home.
d. Robert B. Sellers was solely in charge of public relations with potential clients, employees, business friends, and the general public of the area in which the Nursing Home provides services, and on the date of the accident Robert B. Sellers was in the furtherance of those relationships.
e. Deer hunting is a very popular sport in LaSalle Parish and is a sport that is normally conducted during daylight hours and it naturely follows that deer hunting is conducted during regular work hours and was conducted during the working hours of Robert B. Sellers.
f. It was good public relations for the administrator to hold himself out as one who could and did participate in all facets of the community life including recreation available to residents of the Nursing Home and future residents of the Nursing Home.
g. By participating in hunting events Robert B. Sellers was able to communicate with residents of the Nursing Home and swap hunting stories with the residents for the direct benefit and morale of the Nursing Home.
h. Robert B. Sellers was on a twenty four hour work basis, furnished a company car, a company expense account, reported his activities to no one, was not required to punch a time clock, had sole discretion of how to occupy his working time, and how his working time was consumed, and it was in the furtherance of his regular and routine working schedule that he engaged in the sporting event leading to the injury of plaintiff.
i. Robert B. Sellers was in charge of employee relations at the Golden Age Nursing Home and was in charge of recruiting and maintaining staff at the Nursing Home and Mrs. Nere Ourso was a potential employee or a former employee or a present employee of the Nursing Home, and it was just good business for the Nursing Home for Mr. Sellers to entertain the husband of a former employee, potential employee, or present employee of the Nursing Home.
j. Recreation during the working hours by Robert B. Sellers whether it be a game of ping pong with one of the residents, a game of checkers with one of the residents, a hunting outing with one of the residents or one of the future residents or an employee is good business practice of the Golden Age Nursing Home with the exception, of course, the incident involved in this law suit.
WHEREFORE PETITIONER PRAYS for Judgment as originally alleged.
NOTES
[1] The present suit, number 7215 on our docket and number 15,423 on the trial court docket, originally named as defendants Houston General Insurance Company and Robert "Luke" Sellers. Through a supplemental and amending petition at transcript page 11 plaintiff joined Golden Age Nursing Home, a partnership, and various natural persons allegedly having some connection with the nursing home. In another suit, number 7214 on our docket and number 15,055 on the trial court docket, plaintiff sued Sellers alone. The minute entries in the transcripts indicate that there was also a suit captioned "Robert Milton Breithaupt, Jr. v. Golden Age Nursing Home" which was numbered 15,422. In our record of 7214 at transcript page 36 there is a motion and order filed by plaintiff's attorney signed by the trial judge on December 8, 1978, in which the plaintiffs dismissed without prejudice the Golden Age Nursing Home and the various individuals connected with the home. The motion and order bears the captions and docket numbers of all the cases mentioned above. The separate suits against Sellers and Houston General Insurance Company went to trial in a consolidated jury trial on March 19, 1979. The consolidation of the cases for trial by jury is reflected in a minute entry for December 27, 1978.
[2] This court adopted this standard in Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir. 1979). We applied this standard in our consideration of the appeal in Breithaupt v. Sellers, 380 So.2d 1257 (La.App. 3rd Cir. 1980). Although reaching different conclusions from ours, the Louisiana Supreme Court tested the granting of the motion for directed verdict by the same standard. See page 872 of the Supreme Court opinion in 390 So.2d 870.
[3] Counsel's belief concerning Mr. Hodge's expertise may be gleaned from the following:

"MR. SANDERS: I would like to tender Mr. Hodges at this time as an expert in the field of business that has knowledge of the activities of people in the, that own businesses, and operates business and what they do in the course and scope of their business." Tr. 467
* * * * * *
"THE COURT: ... well, the question is do you believe you can develop material that is relevant to this case?
"MR. SANDERS: I think that Mr. Hodge can become an expert. He can express an opinion of what people who hold and operate businesses do, generally and he can state whether or not hunting is consistent with one of those things."
[4] Houston General also contended that assuming it was proved that Sellers did the shooting, the act of shooting itself would not be within the course and scope of employment. We do not find it necessary to address this issue.